COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-180-CR
  
  
ALPHONSO 
NICKERSON, JR.                                                  APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
THE 371ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
 
I. Introduction
        Appellant 
Alphonso Nickerson, Jr. appeals his convictions for murder and aggravated sexual 
assault.  After the jury rejected Nickerson’s insanity defense and found 
him guilty, the trial court sentenced Nickerson to life in prison.  
Nickerson raises six points complaining about the legal and factual sufficiency 
of the evidence.  We will affirm.
II. Factual 
Background
        On 
June 2, 1997, Nickerson fought with his wife Bennie, whom he suspected was 
having an affair. Nickerson hit Bennie with his hand and then with a belt.  
After Nickerson fell asleep, Bennie called the police, and they took Nickerson 
to jail.
        On 
June 3, 1997, Nickerson was released from jail, and police told him that Bennie 
had obtained a restraining order against him and that he could not return to his 
home.  Nickerson therefore went to Jacqueline Welton’s home.[2]  Welton heard a knock on her door at around 
midnight.  She looked out the peephole and saw Nickerson. Nickerson kept 
knocking and calling Welton’s name, saying that he needed to talk to 
her.  Welton told him through the door that he was not supposed to come by 
her house, but she eventually opened the door.
        Once 
inside, Nickerson told her that he had caught Bennie with another man, had 
confronted the man, and was put in jail.  Welton said Nickerson was angry 
and upset but that he was not acting bizarre. Nickerson explained that he could 
not go back home because of the restraining order.  He suggested Welton 
have sex with him and told her that he could “have [her] right now”; she 
said that he could not, and he responded by saying, “But you let me 
in.”  Nickerson told Welton that no one would believe he had attacked her 
because she had let him in her house. He asked Welton if she would consent to 
sex and indicated that if she did not, he would “take it.”  Welton told 
Nickerson to leave, but he refused and boxed her in as she sat on a couch.  
Welton managed to get up, and she went to the front door, telling Nickerson to 
leave.  Nickerson walked out, but he turned around and put his arm around 
Welton’s neck.  She started screaming, and Nickerson put his hand over 
her mouth and dragged her to the bedroom.  He threw her on the bed and 
pinned her down.  Welton testified that Nickerson laid on top of her, put 
his hand over her mouth, and pulled her clothes off with his other hand.  
She tried to hit him and begged him to stop. Suddenly, Nickerson got up and said 
that he had to leave.  He told her not to call the police and admitted that 
he had assaulted his wife after catching her in bed with a nephew.  Then, 
he left.  Welton’s lip was cut where Nickerson had placed his hand over 
her mouth.  Welton testified that as far as she knew, Nickerson did not 
have any history of mental illness; he had never acted mentally ill in front of 
her; and her interactions with Nickerson never suggested that he did not know 
right from wrong.
        Nickerson 
also called Joann Dawson[3] that night.[4]  Dawson testified that Nickerson wanted to know if he 
could come take a shower and change clothes at her place because he could not go 
home.  She said no.  She testified that Nickerson sounded okay during 
their conversation and that in the years she has known Nickerson, he has been 
rational and has never complained of fits of epilepsy or of a head injury.
        Nickerson 
reportedly spent the night of June 3, 1997 in his truck.  The next morning, 
he went to Maxine Nash's house.  At approximately 9:45 a.m. on June 4, 
1997, a neighbor passed Nash's house and saw Nash talking to a tall, big man, 
wearing jean shorts.  The neighbor testified that Nash appeared to be in 
good health and that everything appeared to be okay.  During the trial, she 
identified Nickerson as the man whom she saw talking to Nash.
        Nash's 
grandson, Dougquallas LeGrand, lived with Nash and came home shortly after 9:45 
a.m.  He knocked on the door for about twenty minutes but received no 
answer.  He found it very odd that Nash did not answer the door, so he 
walked to the back of the house and knocked on the back doors.  As he 
circled the side of the house, he heard a noise.  He knocked on the 
windows, screamed for his grandmother, and broke a window.  Scared, he left 
to get a police officer.  He saw an officer driving down the street, 
flagged down the officer, and the officer followed him back to Nash’s 
house.  From the side of Nash’s house, they heard, “I'm f---ing you, 
I'm f---ing you, I'm f---ing you, you curly-headed motherf—er, I'm f---ing 
you,” being chanted.  The police officer, Marvin Reddick, called for back 
up, and LeGrand kicked in the door.  He saw his “grandmother jacked up in 
the chair with a dude, you know, on his knees, butt naked” and heard Nickerson 
saying the same thing over and over.
        Officer 
Reddick testified that he was responding to another call when LeGrand flagged 
him down at 10 a.m.; LeGrand said that he needed help because he thought 
something was wrong with his grandmother.  Officer Reddick arrived at 
Nash’s house within a minute and a half.  He saw a broken window on the 
east side of the house and heard a television and another noise that sounded 
like moaning.  Officer Reddick was not aware that LeGrand had broken the 
window, so he believed an intruder might be in Nash’s house and called for 
backup.
        Sergeant 
Cortez and Officer Driver arrived two to three minutes later.  Officer 
Reddick testified that, after LeGrand kicked in the front door, he saw a man 
lying on top of someone.  The man was “[lying] atop of [the] complainant, 
and she wasn't moving, but he was humping her, per se, in a sexual manner and 
kept repeating, 'I - I got you, sap-sucker b----, you,' were his exact words. . 
. . He said that repeatedly.”  Officer Reddick explained that Nash was 
slouched in a chair, naked from the waist down, and that her legs were crouched; 
Nickerson was naked and was in between her legs, thrusting at her in a sexual 
fashion.  Officer Reddick testified that Nickerson's genitals were 
contacting Nash's genital area and that it looked like Nickerson was having 
intercourse.  Officer Reddick described Nickerson as having his full body 
weight on top of Nash as he thrust at her; Nash was slumped in the chair, her 
neck was crunched forward, and her face was dark.
        Officer 
Reddick asked Nickerson to get up off of Nash, but Nickerson did not 
respond.  Three or four officers pulled Nickerson off Nash.  The 
police called for their “paddy wagon” because Nickerson could not fit into a 
police car.[5]  The officers lifted Nickerson 
into the “paddy wagon”; Nickerson repeated his phrase without acknowledging 
the police.
        Officer 
Reddick testified that he now knows that the sound he heard outside Nash’s 
window was Nickerson chanting.  He never heard a woman's voice and did not 
notice any scratches on Nickerson. Officer Reddick said that Nickerson's chin 
contacted Nash's forehead as he thrust at her and Nickerson would have been able 
to hear Nash breathe.  Officer Reddick noticed blood at the bottom of the 
chair where Nash sat and saw that Nash's underwear had been torn off.  
Nash's body, including her arms, appeared to be compressed in the chair.  
He noted that rigor mortis had set in on Nash's body.
        When 
Nickerson arrived at jail, a crime analyst took a penile swab from 
Nickerson.  Nickerson was placed into a pressure point chair device for 
restraining unresponsive prisoners.  After approximately thirty seconds in 
the chair, Nickerson appeared alert and asked, “Where am I?”  Sergeant 
Donald Thomas Hanlon testified that he believed Nickerson had been “playing 
possum”—that he was aware of his surroundings and had been faking it; once 
it became uncomfortable for him to sit in the chair, he became responsive so 
that he could get out of the chair.
        Nickerson’s 
case was assigned to a homicide detective with the Fort Worth Police Department, 
Dian Tefft Wright, at 10:20 a.m. on June 4, 1997.  She arrived at Nash’s 
house at 10:38 a.m. and noticed that Nash was “all squashed down in the chair, 
and she didn’t have any clothes on from the waist down, and she was . . . [i]n 
a spread-out position.”  She saw the remains of Nash’s panties—just 
the waistband—across Nash’s abdomen; she thought it looked like the panties 
had been ripped apart at the crotch.  Nash’s head was between her knees, 
and she was twisted over in that position when Wright found her.  She saw 
Nickerson’s blue jean shorts on the floor. She heard Nickerson rambling a 
phrase “like a broken record” and testified that in street parlance, “I 
f----d you,” means sexual intercourse that is generally forceful, possibly 
without consent.  She further testified that it is a slang term, meaning 
“I got what I wanted,” and that it implies a penis penetrating a 
vagina.  She stated that Nickerson chanted more loudly when she tried to 
speak to him.
        Officer 
Wright met with Nickerson the next day in the homicide office.  He was not 
mumbling and appeared rather calm. He said that he understood the Miranda[6] warnings and mentioned that Glynis McGinty was his 
lawyer.  She discontinued the interview, and police took Nickerson back to 
jail.
        Bill 
Watson, formerly a forensic serologist with the Fort Worth Police Department, 
testified that he collected a penile swab sample from Nickerson on June 4, 
1997.  He collected a blood sample from Nickerson on June 5, 1997.  
During the blood draw Nickerson was repeating, “God help me,” or “Help me, 
God.”  He testified that a vaginal swab collected from Nash contained 
sperm.
        Joe 
Warren, who was employed in 1997 as a senior forensic biologist with the Tarrant 
County Medical Examiner’s Office, testified that he did DNA testing on the 
samples collected in this case.  His testing demonstrated that the vaginal 
swabs from Nash contained DNA from which Nash and Nickerson could not be 
excluded as contributors.  The testing on the penile swab taken from 
Nickerson revealed a mixed sample of DNA, and both Nash and Nickerson could have 
contributed to the DNA found in that mixture.  The calculations he 
performed showed that 94.9% of the Caucasian population was excluded, 83.5% of 
the African-American population was excluded, and 96% of the Hispanic population 
was excluded.  He said that assuming that they did not know who the penile 
swab was from, it is 57,800 times more unlikely that the DNA came from two 
unknown people as opposed to Nash and Nickerson.
        Aaron 
Martinez, formerly with the Tarrant County Sheriff’s Department, testified 
that during 1997 he reviewed inmate mail.  He made a report about the 
following letter, written by Nickerson.
  
Dear Von and Mama, I am truly embarrassed and ashamed by these chain of events. 
I did hassle Penny [sic] and Jackie, but I did not kill Ms. Nash. She was like 
Aunt Lindy in Pal Terrace. She introduced me to Joann back in 1980. She worked 
at John Peter Smith Hospital for over 20-plus years as an LVN. . . . She and I 
had been intimidated [sic] once or twice -- once or twice, years ago, when I 
went to visit her. She said that she needed help sexually, but I couldn’t 
respond. She died while I was trying to become erect. I noticed her eyes going 
back in her head, showing nothing but the white. I tried to give her mouth to 
mouth resuscitation, to no available [sic]. She died, and I was in total shock. 
I stayed there, pants down, depressed.
   
        Dr. 
Gary Sisler, deputy medical examiner for Tarrant, Parker, and Denton counties, 
testified regarding Nash’s autopsy results.  He described Nash as a 
sixty-four-year-old woman who was five feet, seven inches tall and weighed 
approximately 185 pounds.  Her white panties were torn through the crotch 
area.  She had bruises on the front of her right and left thighs and lower 
legs, and the color of the bruises indicated that they occurred before her 
death.  The autopsy revealed that while she was alive, Nash had suffered a 
four-inch-deep stab wound near her anus, causing approximately 100 milliliters 
of blood to fill her abdominal cavity.[7]  Dr. 
Sisler opined that a knife with a single sharp blade likely caused the wound and 
that it would be very painful.  Nash suffered a compressive injury to her 
left upper lip, probably when Nickerson put his hand over her mouth and caused 
her lip to be cut by her teeth.  He also noted a small bruise underneath 
Nash’s scalp in the left frontal area, consistent with her head bumping into 
the wooden arms of the chair.  Nash’s face was dark, congested with 
blood.  Dr. Sisler concluded pressure had been applied to Nash’s chest, 
preventing blood from draining from Nash’s face.  Nash was holding her 
hands over her face, a defensive posture, when she died.  Dr. Sisler 
testified that Nash’s injuries are consistent with a struggle and that a 
struggle could not have occurred after Nash was unconscious.
        The 
cause of Nash’s death was sudden death associated with the stab wound to her 
perineum and “overlie,” a form of traumatic asphyxia caused by another 
person’s body weight being placed on the victim’s chest.  He explained 
that “overlie” prevented Nash from breathing.  Within thirty seconds, 
her heart would have started to slow down; within ninety seconds she would have 
“flatlined.”  During this time, Nickerson would have heard Nash 
struggling to breathe.  He said that a man weighing in excess of 300 pounds 
who lays on an elderly woman slouched in a chair commits an act clearly 
dangerous to human life and that a 300-pound body used in this manner is a 
deadly weapon.  In his opinion, Nickerson should have been aware of the 
danger created by a 300-pound man placing his full body weight upon the chest of 
a woman of Nash’s size.
III. Procedural 
Background
        This 
appeal is from a judgment entered following Nickerson’s second trial.  In 
Nickerson’s first trial, a jury found him guilty of murder and of two counts 
of aggravated sexual assault, including aggravated sexual assault by use or 
exhibition of a deadly weapon.  The Waco Court of Appeals held, however, 
that the latter aggravated sexual assault was jeopardy-barred.  The Waco 
Court of Appeals reversed and remanded the cause for a new trial on murder and 
aggravated sexual assault by threat because it held that the State failed to 
timely disclose a videotape depicting an alleged psychotic incident by Nickerson 
on January 8, 1999 while he was in jail.  Nickerson v. State, 69 
S.W.3d 661, 675 (Tex. App.—Waco 2002, pet. ref’d).
        During 
the second trial, Nickerson called three experts to testify concerning his 
affirmative defense of insanity.  The State called its own expert to 
testify to rebut the defense’s position that Nickerson was insane when he 
assaulted and killed Nash.  The jury rejected Nickerson’s insanity 
defense and found him guilty of murder and aggravated sexual assault; the trial 
court sentenced Nickerson to life in prison.  This appeal followed.
IV. Standards 
of Review
        A.     Legal 
Sufficiency Standard of Review
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004).
        This 
standard gives full play to the responsibility of the trier of fact to resolve 
conflicts in the testimony, to weigh the evidence, and to draw reasonable 
inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319, 
99 S. Ct. at 2789. The trier of fact is the sole judge of the weight and 
credibility of the evidence. See Tex. 
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal 
sufficiency review, we may not re-evaluate the weight and credibility of the 
evidence and substitute our judgment for that of the fact finder. Dewberry v. 
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 
U.S. 1131 (2000). We must resolve any inconsistencies in the evidence in favor 
of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 
2000).
        In 
determining the legal sufficiency of the evidence to show appellant's intent, 
and faced with a record that supports conflicting inferences, we “must 
presume—even if it does not affirmatively appear in the record—that the 
trier of fact resolved any such conflict in favor of the prosecution, and must 
defer to that resolution.” Matson v. State, 819 S.W.2d 839, 846 (Tex. 
Crim. App. 1991).
        B.     Factual 
Sufficiency Standard of Review
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt. Id. at 484. There are two ways 
evidence may be factually insufficient: (1) the evidence supporting the verdict 
or judgment, considered by itself, is too weak to support the finding of guilt 
beyond a reasonable doubt; or (2) when there is evidence both supporting and 
contradicting the verdict or judgment, weighing all of the evidence, the 
contrary evidence is so strong that guilt cannot be proven beyond a reasonable 
doubt. Id. at 484-85. “This standard acknowledges that evidence of 
guilt can ‘preponderate’ in favor of conviction but still be insufficient to 
prove the elements of the crime beyond a reasonable doubt.” Id. at 485. 
In other words, evidence supporting a guilty finding can outweigh the contrary 
proof but still be insufficient to prove the elements of an offense beyond a 
reasonable doubt. Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at 481; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder’s. Zuniga, 144 S.W.3d at 482.
        A 
proper factual sufficiency review requires an examination of all the evidence. Id. 
at 484, 486-87. An opinion addressing factual sufficiency must include a 
discussion of the most important and relevant evidence that supports the 
appellant’s complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 
(Tex. Crim. App. 2003).
        C.     Factual 
Sufficiency Standard of Review for Insanity Defense
        Insanity 
is an affirmative defense to prosecution. Tex. 
Penal Code Ann. § 8.01(a) (Vernon 2003). To prevail on the affirmative 
defense of insanity, the defendant must prove by a preponderance of the evidence 
that, at the time of the conduct charged, and as a result of severe mental 
disease or defect, he did not know that his conduct was wrong. Id. §§ 
2.04(d), 8.01(a). The purpose of a jury finding on the insanity defense is to 
determine whether the accused should be held responsible for the crime or 
whether a mental condition excused the defendant from such responsibility. Graham 
v. State, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978).
        Legal 
insanity is not strictly a medical issue. Id. at 949. Experts may help 
the jury in their determination, but the experts cannot dictate an insanity 
determination. Id. The jury may accept or reject, in whole or in part, 
the opinion testimony of medical or psychological experts and may accept lay 
testimony over the testimony of experts. Id. Likewise, the jury may 
choose to believe or disbelieve any witnesses or any portion of a witness’s 
testimony and may believe a witness even though his testimony is contradicted. Turro 
v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). As an appellate court, 
when faced with conflicting inferences, we must presume that the trier of fact 
resolved any such conflict in favor of the verdict and must defer to that 
resolution. Smetana v. State, 991 S.W.2d 42, 44 (Tex. App.—Tyler 1998, 
pet. ref’d).
        In 
conducting a factual review of an affirmative defense, the proper standard for 
review is, whether after considering all the evidence relevant to appellant's 
affirmative defense of insanity, the judgment is so against the great weight and 
preponderance of the evidence so as to be manifestly unjust. Bigby v. State, 
892 S.W.2d 864, 875 (Tex. Crim. App. 1994).
V. Proof of 
Nickerson’s Sanity
        In 
his sixth point, Nickerson contends that the evidence is factually insufficient 
to negate his insanity defense. The State responds that, viewing all of the 
evidence, the jury’s failure to find that Nickerson was insane at the time of 
the offense was not against the great weight and preponderance of the evidence.
        A.     Expert 
Testimony
        During 
the trial, the defense called three doctors—Dr. Clifford Alan Hopewell, Dr. 
Allen Childs, and Dr. Kelly Goodness—to testify in support of Nickerson’s 
affirmative defense of insanity. The State called Dr. Tim Proctor. Each of the 
experts reviewed Nickerson’s mental and medical history, Nickerson’s version 
of the events, and video tapes of Nickerson’s behavior in jail. The experts 
discussed with the jury Nickerson’s possible diagnoses, other explanations for 
Nickerson’s behavior, and whether Nickerson knew right from wrong.
                1.     Defense 
Witness—Dr. Clifford Alan Hopewell
        Dr. 
Hopewell explained that although Nickerson has a college degree and has taught 
school, his IQ is 70.  Dr. Hopewell said that the discrepancy between 
Nickerson’s college education and his current level of mental functioning 
indicate that Nickerson has experienced a mental decline over time.  He 
said that Nickerson’s background showed sexual maladjustment and marital 
instability.  The overall results of Dr. Hopewell’s testing indicate that 
Nickerson possesses a lowered intellectual functioning level and has problems 
with the frontal and temporal lobes of his brain.  Dr. Hopewell explained 
that damage to the brain’s temporal lobes disrupts a person’s perception of 
reality, which may lead to personality changes.
        Dr. 
Hopewell diagnosed Nickerson as suffering from a catatonic disorder due to 
subclinical temporal lobe epilepsy and testified that Nickerson experienced a 
seizure during the murder. Nickerson told Dr. Hopewell that he could not 
remember the offense. And, according to Dr. Hopewell, after a seizure episode it 
is likely that Nickerson would not recall the offense but would recall only 
things other people told him about it. Dr. Hopewell admitted that typically a 
neurologist, not a neuropsychiatrist like himself, would diagnose epilepsy; that 
he does not know anyone who, prior to June 4, 1997, witnessed an epileptic 
seizure by Nickerson; and that Nickerson’s EEG and MRI are normal.  
Nickerson told Dr. Hopewell that he had received a head injury when he was 
eight, but he denied any history of head injuries, loss of memory, amnesia, or 
epilepsy on a recent employment application.
        Dr. 
Hopewell reviewed the January 8, 1999 tape of Nickerson in jail.  He 
testified that the tape did not show Nickerson malingering; instead, it 
documented a psychotic episode.
                2.     Defense 
Witness—Dr. Allen Childs
        Dr. 
Childs, the chief psychiatrist of the multiple disabilities unit at North Texas 
State Hospital in Vernon, got involved in Nickerson’s case after Dr. Goodness 
requested his services. He testified that Nickerson’s mother told him that 
Nickerson had spells as a child where he would “be out of it,” staring away 
glassy-eyed. According to Dr. Childs, not long before the June 4, 1997 event, 
Nickerson was hit in the front of his head with a metal bar.
        Nickerson 
told Dr. Childs that he just wanted to take a shower at Nash’s house; when he 
got out of the shower, Nash was dead. Nickerson said the police cut off his 
undershorts to make it look like he had raped Nash. Nickerson also blamed his 
actions on mental illness stemming from a fall he took off a company truck, from 
receiving steroid shots in the past, from taking ten different kinds of pain 
medications, and from being drugged by the coffee at home. Dr. Childs doubted 
that Nickerson was having intercourse with Nash; he believed that Nickerson’s 
use of the “f word” did not indicate penetration, only a state of automatic 
behavior. According to Dr. Childs, the whole catatonic episode Nickerson 
experienced at Nash’s house is not compatible with sexual arousal. Dr. Childs 
testified that Nickerson’s letter to his mother, confirming parts of the 
offense, does not negate Nickerson’s insanity during the offense because 
Nickerson may have created memories to fill in the episode. Dr. Childs believed 
that Nickerson did not know what happened during the June 4, 1997 episode.
        Dr. 
Childs testified that the January 8, 1999 tape documents an episode of catatonic 
excitement experienced by Nickerson. The tape shows Nickerson being sprayed with 
pepper spray, and Dr. Childs testified that Nickerson’s lack of perception of 
pain is typical of a catatonic episode. The tape also shows Nickerson flooding 
his cell and laying in the water on the floor to remove the pepper spray. This 
behavior was not “purposeful behavior” according to Dr. Childs and did not 
demonstrate goal-oriented behavior. The January 6, 1999 tape shows Nickerson 
praying for hours, refusing meals, and being unresponsive to jail personnel. Dr. 
Childs believes that this tape shows Nickerson having early signs of a psychotic 
episode. He does not believe that Nickerson was malingering.
        Dr. 
Childs concluded that Nickerson suffers from a condition called periodic 
catatonia, a seizure-like behavior that resembles temporal lobe epilepsy. He 
said that Nickerson’s behavior on June 4, 1997 was consistent with the type of 
seizures that he thinks Nickerson has; Nickerson could go from appearing to 
carry on a conversation with a person in the front yard to this catatonic state 
where he would not know what he was doing.  He saw no similarities between 
Nickerson’s attempted assault of Welton ten hours earlier and his assault of 
Nash.  Nickerson’s mental state was different on June 4, 1997 than it was 
the night before.
        Dr. 
Childs explained that although Nickerson’s MRI and EEG, performed within six 
weeks of trial, were normal, a person with periodic catatonia can have a normal 
EEG.  Dr. Childs stated that at the time of the offense, Nickerson did not 
know right from wrong and was not sane within Texas’s definition of that term.
                3.     Defense 
Witness—Dr. Kelly Goodness
        Dr. 
Goodness, a clinical and forensic psychologist, testified that Nickerson told 
her that he used his belt to “spank” his wife, as if she were a child.  
Dr. Goodness said Nickerson’s attitude towards women was not good; it was 
hostile or demeaning. Nickerson’s MMPI testing revealed that he is a three 
four four three; “the most salient characteristic of the three four four three 
person is chronic, intense anger.  They harbor hostile and aggressive 
impulses, but they are unable to express their negative feelings 
appropriately.”
        She 
testified that Nickerson had no ability during the offense to think through or 
comprehend his actions. Nickerson’s lack of reaction when the police burst in 
to Nash’s house indicates to her that Nickerson did not understand that what 
he was doing was wrong. Nickerson’s behavior on the January 8, 1999 tape was, 
in her opinion, so striking that it was impossible for Nickerson to fake. She 
said she did not observe any goal-oriented behavior by Nickerson on the January 
8, 1999 tape. In her opinion, Nickerson could not be engaged in goal-oriented 
behavior during that type of seizure. After seeing the video, she began to think 
that there was something organically wrong with Nickerson’s brain.
        Dr. 
Goodness believes that Nickerson was psychotic and was having a seizure when 
LeGrand knocked on Nash’s door.  Her conclusion from all the data is that 
Nickerson was in a catatonic psychotic state throughout the offense.
        After 
Dr. Goodness read portions of Welton’s testimony from the first trial, she 
agreed that she was doubtful that Nickerson was insane during Nash’s 
murder.  She admitted that insanity is especially rare in a sexual assault 
case.  Also on cross-examination, Dr. Goodness admitted that in a phone 
call she told the district attorney, “I have no way of knowing whether or not 
Mr. Nickerson was in the midst of his catatonic episode at the moment that he 
began assaulting Ms. Nash or whether the episode began during the assault.”
                4.     State’s 
Witness—Dr. Tim Proctor
        Dr. 
Proctor, a clinical psychologist, testified that he had reviewed numerous 
documents and the jail video tapes and that he had met with Nickerson for two 
and a half hours.  Nickerson was cooperative during the interview and did 
not present with any symptoms of mental illness.  Nickerson told Dr. 
Proctor that he had a bachelor of science and a master’s degree, he described 
six incidents of head injuries that he claimed to have suffered, and he admitted 
that he had a history of domestic violence. Nickerson then described the days 
leading up to the June 4, 1997 event.
        With 
regard to the event itself, Nickerson said that he came out of Nash’s bathroom 
and found Nash in a chair in the “fetus [sic] position.”  He thought 
that Nash had choked, so he performed the Heimlich maneuver and mouth-to-mouth 
resuscitation.  Nickerson said that police arrived and cut off his shorts 
and underwear.  He stated that he did not know how Nash’s stab wound 
occurred, and he denied any sexual conduct.  Dr. Proctor summarized his 
perspective of Nickerson’s mental state during the events described by 
Nickerson as leading to the murder.  Nickerson knew the day before the 
murder that his actions toward Bennie were wrong; police did not notice anything 
unusual about Nickerson’s mental state; Nickerson had a goal-oriented 
conversation with Joann Dawson; and he told Welton not to call the police after 
he almost assaulted her.  Dr. Proctor testified that the fact Nickerson 
ripped off Nash’s underwear constitutes a purposeful, goal-oriented act.
        In 
the video tapes of Nickerson, Dr. Proctor observed manic behavior, characterized 
by racing speech for an extended duration and sexual acting out.  He noted 
that Nickerson acknowledged the presence of other people during his rages.  
He summarized the goal-oriented behaviors that Nickerson engaged in—flooding 
his cell, masturbation-like activity, having a towel waiting to wipe pepper 
spray off his face, and placing his arms in the bars to block the jail cell 
locking mechanism.  Nickerson admitted to Dr. Proctor that he flooded and 
urinated in his cell to make it hard for the guards to get their footing. Dr. 
Proctor concluded that there is no evidence that Nickerson’s condition at the 
time of the offense resembled his behavior on the tape.
        With 
regard to the similarities between Nickerson’s actions towards Welton and the 
offense committed against Nash, Dr. Proctor noted that it was very striking that 
(1) the injuries to both Welton’s and Nash’s lips were in precisely the same 
place and (2) Nickerson boxed Welton into a couch and compressed Nash into a 
chair.
        Dr. 
Proctor diagnosed Nickerson as suffering from bipolar disorder that was in 
remission during trial. He also noted that Nickerson has antisocial and paranoia 
personality traits.  He stated that Nickerson’s behavior and actions were 
clearly violent, aggressive, hostile, and demeaning to women, but did not 
demonstrate a mental illness. Dr. Proctor found no evidence of epilepsy and no 
evidence of organic brain damage; he thus disagreed with Dr. Childs’s and Dr. 
Goodness’s opinions.
        In 
Dr. Proctor’s opinion, Nickerson knew right from wrong at the time he 
assaulted and killed Nash. Dr. Proctor stated that there is no indication that 
Nickerson did not know right from wrong. The State questioned Dr. Proctor 
regarding Nickerson’s mental state when he committed the offenses against 
Welton and Nash:
   
Q. Okay. It’s just very difficult to believe he would commit the exact same 
offense almost ten hours earlier and then suddenly ten hours later tries to 
recommit the same behavior and suddenly he’s insane?
  
A. 
I think that would be a large leap to take that I don’t see any support for.
 
 
Additionally, 
Nickerson admitted to Dr. Proctor that he knew right from wrong, that murder and 
rape are against the law, and that he was aware of that at the time of the 
offense.
        B.     Analysis
        Nickerson 
presented expert opinion evidence that he was insane at the time that he 
sexually assaulted and killed Nash and presented evidence that he acted 
bizarrely in jail. The record also includes lay and expert testimony that 
Nickerson had no history of mental illness and that he was not legally insane on 
June 4, 1997. The jury’s responsibility was to determine whether Nickerson’s 
evidence or the State’s evidence was more credible and to determine the weight 
to be given to that evidence on the one issue that mattered: whether Nickerson, 
as a result of mental defect or illness at the time he sexually assaulted and 
murdered Nash, did not know that his conduct was wrong. The jury could have 
believed that Nickerson was malingering a mental illness, was a rapist, or was 
in the throws of a manic episode associated with bipolar disorder and that he 
retained the mental capacity to conform his actions to the law. The jury could 
have considered Nickerson’s own statement to Dr. Proctor as evidence that he 
knew right from wrong when he assaulted and killed Nash on June 4, 1997. See, 
e.g., Turro, 867 S.W.2d at 47. We hold that the evidence is factually 
sufficient to refute Nickerson’s affirmative defense so that the jury’s 
verdict is so against the great weight and preponderance of the evidence as to 
be manifestly unjust. See Bigby, 892 S.W.2d at 878 (holding evidence 
sufficient to negate insanity defense even though several expert witnesses 
testified that appellant knew his conduct was illegal but did not know the act 
was “morally” wrong); Smetana, 991 S.W.2d at 47 (holding evidence 
sufficient to negate insanity defense even though there was conflicting lay and 
expert testimony). We overrule Nickerson’s sixth point.
VI. Intent to 
Cause Serious Bodily Injury
        In 
his first point, Nickerson argues that the evidence is legally and factually 
insufficient to prove that he acted with intent to cause serious bodily injury 
to Maxine Nash. Specifically, Nickerson contends that the record contains no 
evidence that he intended to cause serious bodily injury of any type to Nash by 
lying down on her and that any circumstantial evidence presented by the State 
was greatly outweighed by the evidence of his defective mental state.
        A 
jury may infer intent from the acts and words of the defendant, the manner in 
which the offense was committed, the nature of the wounds inflicted, and the 
relative size and strength of the parties. See Patrick v. State, 906 
S.W.2d 481, 487 (Tex. Crim. App. 1995); West v. State, 846 S.W.2d 912, 
914 (Tex. App.—Beaumont 1993, pet. ref’d).
        Here, 
the parties stipulated that Nickerson is six feet, six inches tall and weighs 
300 pounds. The medical examiner testified that Nash was five feet, seven inches 
tall and weighed approximately 185 pounds.  When Nickerson laid on top of 
Nash[8] as she sat in the chair and as he began 
sexually assaulting her, his chin contacted Nash’s forehead; he was so close 
to her face that he would have noticed her struggling to breathe, noticed her 
face becoming dark, and noticed her eyes rolling back into her head. 
Additionally, the compression wound to Nash’s lip, which was in the same place 
as Welton, enabled the jury to infer that Nickerson placed his hand over 
Nash’s mouth, further limiting her ability to breathe.
        The 
medical examiner testified that a 300-pound man should realize that he cannot 
lay on top of a woman of Nash’s size for any length of time without 
suffocating her. The record demonstrates, however, that Nickerson did not get up 
when Nash struggled.  He did not attempt to resuscitate her; he remained on 
top of her, even after she died, and continued thrusting at her body until 
multiple police officers pulled him off. Consequently, the jury had before it 
sufficient evidence—Nickerson’s acts and words during the offense, the 
manner in which the offense was committed, the nature of the wounds inflicted, 
and the relative size and strength of the parties—from which it could infer 
Nickerson intended to cause serious bodily injury to Nash.  Furthermore, 
because we have held that the evidence supports the jury’s determination that 
Nickerson was sane at the time of the offense, we are not persuaded that a 
defective mental state prevented him from formulating an intent to cause serious 
bodily injury.[9]
        Viewing 
the evidence in the light most favorable to the verdict, we hold that a rational 
trier of fact could have found beyond a reasonable doubt that Nickerson acted 
with the intent to cause serious bodily harm. Jackson, 443 U.S. at 319, 
99 S. Ct. at 2789; Nickerson, 69 S.W.3d at 667. Furthermore, viewing all 
the evidence in a neutral light, favoring neither party, we also conclude that 
the evidence supporting this finding, taken alone, is not too weak to support 
the finding of guilt beyond a reasonable doubt and that the contrary evidence is 
not so strong that guilt cannot be proven beyond a reasonable doubt. See 
Patterson v. State, 950 S.W.2d 196, 202 (Tex. App.—Dallas 1997, pet. 
ref’d) (holding that factually sufficient evidence existed to show appellant 
intended to kill or to cause serious bodily injury). Accordingly, we hold that 
the evidence is both legally and factually sufficient to establish that 
Nickerson intended to cause death or serious bodily injury to Nash. We overrule 
Nickerson’s first point.
VII. Act 
Clearly Dangerous to Human Life
        In 
his second point, Nickerson contends that the evidence is legally and factually 
insufficient to prove that he committed an act clearly dangerous to human life. 
Specifically, Nickerson argues that no evidence exists or that the evidence is 
factually insufficient to prove that his act of lying down on Nash was clearly 
dangerous to human life.
        Nickerson’s 
premise is that no rational jury could have reached the conclusion—his act of 
lying on Nash was clearly dangerous to human life—beyond a reasonable doubt 
because “men have been lying down on women during sexual intercourse since the 
human race began.” However, the medical examiner directly testified that a man 
who weighs over 300 pounds commits an act clearly dangerous to human life by 
lying on a smaller, elderly woman in a chair and causing her to stop breathing 
by the weight of his body. Consequently, a rational juror could have concluded 
that Nickerson’s exertion of his own weight upon Nash was “objectively 
clearly dangerous to human life.” See Nickerson, 69 S.W.3d at 667; see 
also West, 846 S.W.2d at 914-15 (holding evidence of slapping of 105-pound 
woman in the mouth by 200-pound “award-winning bodybuilder” sufficient to 
establish conduct “clearly dangerous to human life”). We overrule 
Nickerson’s second point.
VIII. Proof of 
Aggravating Elements
        In 
his fourth point, Nickerson claims that the evidence is legally and factually 
insufficient to prove the aggravating elements of Texas Penal Code sections 
22.021(a)(2)(A)(ii) and (iii).  See Tex. Penal Code Ann. § 22.021(a)(2)(A)(ii), 
(iii) (Vernon Supp. 2004-05).  Specifically, Nickerson asserts that the 
record contains no evidence that his actions caused fear in Nash that would have 
caused her to submit because the two had known one another for a long time.
        In 
determining whether the State established the aggravating element of the 
offense, the jury must assess whether the complainant was fearful, whether the 
defendant’s conduct caused that fear, and whether the complainant’s fear was 
a reasonable result of the defendant’s conduct. Grunsfeld v. State, 813 
S.W.2d 158, 162 (Tex. App.—Dallas 1991), aff’d, 843 S.W.2d 521 (Tex. 
Crim. App. 1992); Douglas v. State, 740 S.W.2d 890, 891 (Tex. App.—El 
Paso 1987, no pet.); see also Kemp v. State, 744 S.W.2d 243, 245 (Tex. 
App.—Houston [14th Dist.] 1987, pet. ref’d). The first element, whether the 
complainant was in fact fearful, is usually established by the testimony of the 
complainant. Douglas, 740 S.W.2d at 891. In examining the second and 
third elements, the jury may consider the defendant’s objective conduct, i.e., 
acts, words, or deeds, and infer from the totality of the circumstances whether 
his overall conduct was the producing cause of the complainant’s fear and 
whether the subjective state of fear was reasonable in light of such conduct. Brown 
v. State, 960 S.W.2d 265, 268 (Tex. App.—Corpus Christi 1997, no pet.); Kemp, 
744 S.W.2d at 245. Where the objective facts of the assault would naturally 
cause the complainant to fear for her life or serious bodily injury, it is 
reasonable to assume that the complainant had the requisite level of fear in the 
absence of some specific evidence to the contrary. Brown, 960 S.W.2d at 
268. Thus, the fact finder may infer from the totality of the circumstances 
whether a person’s overall conduct placed the victim in fear of death or 
serious bodily injury. Elkins v. State, 822 S.W.2d 780, 783 (Tex. 
App.—Houston [14th Dist.] 1992, pet. ref’d).
        Here, 
we do not have the testimony of the complainant to assist us because she is 
dead. However, the evidence demonstrates that Nash received the following 
injuries before she died: bruises to the front of her right and left thighs and 
lower legs, a four-inch-deep stab wound near her anus, and a small laceration 
under her left upper lip. Moreover, police discovered Nickerson lying on top of 
Nash, thrusting at her, while Nash was slouched in the chair.
        Clearly, 
a rational trier of fact, looking at the totality of the circumstances, could 
find that Nash was fearful, that Nickerson caused Nash’s fear, and that 
Nash’s fear was reasonable. A person who receives a four-inch-deep stab wound 
near her anus, endures having her underwear torn off her body, is forcibly 
pinned by a 300-pound man into a chair in a position that suffocates her, while 
hearing him repeat forceful, vulgar language, would be in fear of death or 
serious bodily injury. See Nickerson, 69 S.W.3d at 669; see also 
Lewis v. State, 984 S.W.2d 732, 734 (Tex. App.—Fort Worth 1998, pet. 
ref’d); Mata v. State, 952 S.W.2d 30, 32 (Tex. App.—San Antonio 1997, 
no pet.); Elkins, 822 S.W.2d at 783 (all holding that legally sufficient 
evidence existed in which objective acts and words utilized by appellant 
produced a subjective fear of imminent death or serious bodily injury on part of 
complainant). We overrule Nickerson’s fourth point.
IX. Nash Was 
Alive at the Time of the Alleged Sexual Assault
        In 
his third point, Nickerson contests the legal and factual sufficiency of the 
evidence to prove that Nash was alive at the time of the alleged sexual assault.
        The 
testimony at trial revealed that Nash was alive around 9:45 a.m. on June 4, 1997 
when a neighbor drove by and saw Nash standing in her front yard, talking to 
Nickerson. Approximately fifteen minutes later, LeGrand heard a noise which 
turned out to be Nickerson chanting, “I'm f---ing you, I'm f---ing you, I'm 
f---ing you, you curly-headed motherf—er, I'm f---ing you.” When Officer 
Reddick entered Nash’s house a few minutes later, he saw Nickerson on top of 
Nash engaged in intercourse with Nash. The medical examiner testified that death 
from “overlie” occurs within minutes. The medical examiner also testified 
that the stab wound near Nash’s anus would have bled more if Nickerson had not 
remained on top of Nash from when the wound was made until she died. The absence 
of more blood from this wound supports an inference that Nickerson was on top of 
her for the purpose of assaulting her while she was alive.
        Viewing 
all the evidence in the light most favorable to the verdict, we hold that a 
rational trier of fact could have found beyond a reasonable doubt that Nash was 
alive at the time that Nickerson began sexually assaulting her. See Santellan 
v. State, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) (holding that 
reasonable inference that victim was alive when appellant placed her in car 
existed because medical examiner’s testimony did not provide unequivocal 
evidence that victim was dead at the time; medical examiner admitted that her 
heart might still beat for three to five minutes after bullet hit her head). We 
overrule Nickerson’s third point.
X. Proof that 
Nickerson Inserted His Penis into Nash’s Sexual Organ
        In 
his fifth point, Nickerson argues that the evidence is legally and factually 
insufficient to prove that he inserted his penis into Nash’s female sexual 
organ. While proof of the slightest penetration is sufficient, this element of 
the offense must be proved beyond a reasonable doubt. Nilsson v. State, 
477 S.W.2d 592, 595 (Tex. Crim. App. 1972). Penetration may be proved by 
circumstantial evidence. Id.
        When 
Officer Reddick entered Nash’s house, he found Nickerson lying on top of Nash, 
and Nickerson appeared to be engaged in intercourse. A forensic biologist 
testified that a vaginal swab from Nash revealed the presence of sperm and that 
he found epithelial cells from Nash in Nickerson’s penile swab.
        Viewing 
all the evidence in the light most favorable to the verdict, we hold that a 
rational trier of fact could have found beyond a reasonable doubt that Nickerson 
penetrated Nash’s female sexual organ with his penis. See generally Vernon 
v. State, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992) (holding that pushing 
aside and reaching beneath a natural fold of skin into an area of body not 
usually exposed to view, even in nakedness, is significant intrusion beyond mere 
external contact, amounting to penetration). We overrule Nickerson’s fifth 
point.
XI. Conclusion
        Having 
overruled Nickerson’s six points, we affirm the trial court’s judgment.
  
   
                                                          SUE 
WALKER
                                                          JUSTICE
 
 
 
PANEL 
B:   LIVINGSTON, GARDNER, and WALKER, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
June 9, 2005

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
Welton met Nickerson in 1991 when they both applied for jobs as teacher’s 
aides.  They became friends and talked twice a month by phone.
3.  
Dawson had known Nickerson since 1979 or 1980 and had a personal relationship 
with him until 1985.
4.  
The record is not clear whether Nickerson visited Jacqueline Welton first or 
called Joann Dawson first.  During this time frame, Nickerson also 
attempted to contact Alice Tate, but she was not home.
5.  
Nickerson is six feet, six inches tall and weighs three hundred pounds.
6.  
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).
7.  
Dr. Sisler stated that the small amount of blood at the scene from this wound 
means that Nickerson’s body remained pressed down on Nash’s body from the 
time the wound was inflicted until Nash’s death.
8.  
The record is replete with evidence showing that Nickerson intended to sexually 
assault Nash.  For example, Dr. Goodness’s report stated, “Given that 
Mr. Nickerson had attempted to sexually assault Ms. Welton prior to assaulting 
Ms. Nash, logic dictates Mr. Nickerson may well have intended sexually 
assaulting Ms. Nash.”  She also admitted that the similarity of the two 
offenses suggests that Nickerson had intent with Nash.
9. 
Nickerson’s factual sufficiency analysis under each of his remaining points is 
centered on his “defective mental state” argument. Because we have addressed 
that argument in detail under his insanity defense point and ruled against him, 
we need not address it each time that it is raised hereafter.  See Tex. R. App. P. 47.1.