**Jack WEST, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–91–058 CR.**

Court of Appeals of Texas, Beaumont.

Jan. 20, 1993.

Rehearing Denied Feb. 11, 1993.

Discretionary Review Refused April 14, 1993.

Willis Everett Smith, Kingwood, for appellant.

Peter C. Speers, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe, for state.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

A jury convicted Jack West, Jr. of the murder of his wife, Brenda, and assessed punishment at twenty-eight (28) years in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises three points of error, *viz:*

Point of Error One: The jury erred in ruling that the evidence was sufficient to support a finding that the appellant, while slapping his wife and thus causing her death, was guilty of murder.

Point of Error Two: The State was required, but failed, to prove the absence of "sudden passion" and "adequate cause" beyond a reasonable doubt in order to convict the appellant of murder.

Point of Error Three: The trial court erred when it refused appellant's request to include in the jury charge during guilt/innocence, a charge on self-defense.

Appellant was indicted under TEX.PENAL CODE ANN. sec. 19.02(a)(2) (Vernon 1989) and the jury was charged, in pertinent part:

... Jack West, Jr., did then and there intentionally or knowingly, with intent to cause serious bodily injury to an individual, Brenda West, commit an act clearly dangerous to human life, to-wit: strike Brenda West about her head with the defendant's hand or fist or an object, the nature of which is unknown to the Grand Jury, thereby causing the death of the said Brenda West, as alleged in the indictment, and you further find beyond a reasonable doubt that the defendant, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of murder....

■ Appellate review of the sufficiency of evidence to sustain a conviction is governed by the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); that standard requiring the reviewing court to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson* illuminates the appellate standard further by providing:

This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (emphasis theirs)

*Jackson, supra* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

■ Appellant argues under his first point of error that the State failed to prove (1) intent to cause serious bodily injury and (2) that appellant committed an act clearly dangerous to human life. Appellant also contends that the State was required to prove an intent to kill. Since appellant was tried under section 19.02(a)(2), the State was not required to prove a specific intent to kill. *Harrell v. State*, 659 S.W.2d 825, 827 (Tex.Crim.App.1983).

■ Intent to cause serious bodily injury is a question of fact to be determined by the trier of fact from all the facts and circumstances in evidence. *Hemphill v. State*, 505 S.W.2d 560, 562 (Tex.Crim.App. 1974). Furthermore, intent may be inferred from the actions, words, and conduct of the defendant. *Beltran v. State*, 593 S.W.2d 688, 689 (Tex.Crim.App.1980). In the instant case, while appellant testified that he did not intend to seriously injure, much less kill, his wife, he did admit to slapping her once or perhaps two or three times in the mouth with his open hand. He also admitted to taking his wife by the neck and forcing her back on the bed. The evidence also showed that appellant was an award-winning bodybuilder who weighed approximately 200 pounds while the victim was a small woman weighing approximately 105 pounds. Additional testimony from

several sources indicated that appellant, over the course of the marriage, physically abused and terrorized his wife. Typical of such evidence is the following testimony of appellant's twenty-one year old son, Curtis West:

Q. (the State) Had you ever seen anything else similar to what you have just described happen before in the house?

A. (Curtis West) Yes, sir.

Q. On few or many occasions?

A. Many.

Q. You made a motion with your finger. Would you stand up and demonstrate to the jury how Jack West called Brenda over to him?

A. He would say, "come here."

(The witness complies, by beckoning.)

Q. What would she do?

A. She would be shaking.

Q. Would she come to him?

A. Yes, sir.

Q. Thank you. And what would happen after she came up to him?

A. He would hit her with his fist.

Q. Did you ever, during any of these incidents where you saw your father hit your mother, did you ever hear him make any comments?

A. Yes, sir.

Q. Statements?

A. He said that, "One of these days, I'm going to kill you, Brenda. You're going to make me kill you."

Q. Have you heard him say that more than once?

A. Yes, sir.

Q. Have you heard him say that on few or many occasions?

A. Many.

We find the above and other similar evidence in the record before us sufficient to permit the jury to at least infer that appellant intended to cause serious bodily injury to his wife and committed an act clearly dangerous to human life. Point of error one is overruled.

■ The basis of appellant's second point of error stems from the testimony of appellant regarding the events that led up to the point when appellant struck his wife. Appellant testified that he and his wife were arguing about several things. At one point during the argument, appellant told his wife, "I ought to pop you on your butt with a belt." According to appellant, his wife reacted by grabbing appellant's penis with one hand and then the other.[1] Appellant stated that his wife continued to hold and squeeze appellant's penis until he slapped her. We find this testimony sufficient to raise the issue of "sudden passion" and "adequate cause." Indeed, *Medlock v. State*, 591 S.W.2d 485, 486 (Tex.Crim.App. 1979) provides that the testimony of the accused alone is sufficient to raise the issue, and the weight, truth, or falsity of the testimony is immaterial.

We find the issue of voluntary manslaughter was raised by appellant's testimony, but the jury nevertheless returned a verdict of murder. We are now required to make two determinations: (1) whether the evidence was sufficient to establish the offense of murder and (2) whether the evidence was sufficient to disprove the issue of sudden passion. *Johnson v. State*, 815 S.W.2d 707, 711 (Tex.Crim.App.1991). As we have already found in point of error one that the evidence was sufficient to establish the charge of murder under section 19.02(a)(2), we now turn to the second determination as raised by appellant's second point of error.

■ While we recognize language in *Johnson* to the effect that a jury may reject sudden passion, even though it is raised by the evidence; but the jury may not find facts necessary to establish the absence of sudden passion "purely on the basis of its disbelief of the accused's contrary assertions," *Id.* at 711; citing *Gold v. State*, 736 S.W.2d 685, 689, 690 (Tex.Crim. App.1987), *overruled in part on other grounds by, Torres v. State*, 785 S.W.2d 824 (Tex.Crim.App.1989). We also take

---

1. Appellant had already testified to the fact that both he and his wife were nude from the waist down during the fatal confrontation.

note of the fact that the standard for reviewing a jury's finding of absence of sudden passion is the same as the standard enunciated in *Jackson v. Virginia, supra,* for reviewing sufficiency of evidence complaints in general. Applied to the instant situation, we must determine whether any rational trier of fact could have found sufficient evidence establishing the absence of sudden passion beyond a reasonable doubt. *See, Torres, supra* at 824–825.

█ Under the record before us in the instant case, we hold that a rational trier of fact could have found sufficient evidence establishing the absence of sudden passion beyond a reasonable doubt.

In the first place, a careful reading of the entire record reveals that appellant's defense was geared significantly toward portraying the victim as an alcoholic who had a chronic problem with keeping her balance, and who, on the day in question, was intoxicated and possibly injured herself by falling down and striking her head on some unknown object. Indeed, a lengthy narrative by appellant contained in the transcript of appellant's Grand Jury testimony dealt exclusively with the victim's high propensity for falling down, with the victim's alcoholism, with the victim's mental disorder, and about appellant becoming "disfunctional" (sic) and being severely frustrated with having to live with his wife's conditions.

The record also raises problems with appellant's credibility as, on the day in question, appellant related three different versions of the incident to three different people. State's witness Kelly Smith, the first of the emergency medical personnel to arrive on the scene, testified that when appellant was asked what the problem was, appellant responded, "I don't know. She fell." The second version was apparently related to the emergency room physician by appellant. The physician's report reflects the following: "This 46–year old female is reported by her husband to have been found in a very sleepy state sitting on a couch about mid-morning. She is reported to have aroused normally about 7 to 8 o'clock without difficulties." The third version was the one he related to the police and testified to at trial. This version was elicited from appellant during direct examination by his attorney and is reproduced as follows:

Q. (counsel for appellant) All right. When you started talking with Brenda that morning, where, where were you and where was she?

A. (appellant) We were standing at the foot of the bed.

Q. Okay. And do you recall how you were dressed and how she was dressed?

A. I think she had on a blue tank top, the same one that she had when she arrived at the hospital. And I don't know what I had on up top, but we didn't have, we didn't sleep with anything on, on the bottom.

Q. So, maybe you probably both had something on on [sic] the top of your body and nothing on the bottom?

A. That's correct.

Q. What were you wanting to talk to her about?

A. About why she wasn't being more responsible about the dog.

Q. Do you recall what you said, or did you ask her or tell her or—

A. Yes, I asked her about it and she said, she said the same thing that she said the previous night.

Q. What was that?

A. She had eaten something and fell asleep.

Q. Were you all screaming and yelling at each other or was it—tell the jury what kind of conversation was taking place.

A. Oh, it was calm at that time.

Q. Did the calmness change?

A. Yes.

Q. What caused the calmness to change?

A. When Brenda gave me the same answer, because then I had made up my mind I was probably going to have to put the dog in the back room and just put some paper on the floor.

Q. So you got angry?

A. No, I wasn't angry then, I was frustrated. See, because of my, I couldn't understand what was wrong with my

wife. I didn't know she was still drinking that heavily. I was doing my best to try to keep her from drinking. If she doesn't have an enlarged liver, I couldn't believe it. I was doing my best to try to keep my wife from drinking and I didn't know she was still drinking and I couldn't understand how she could be that irresponsible. I was just frustrated at that point.

Q. Then after you got frustrated, did you go to take care of the dog, or what happened?

A. I started yelling. When I get frustrated with my wife, there's no need to talk to her and I always feel better after I started yelling.

Q. Okay. So you started yelling at her?

A. (The defendant nods affirmatively.)

Q. At the point in time that you started yelling at her, were you still standing, both of you, at the foot of the bed?

A. Yes.

Q. What happened when you started yelling at her?

A. She grabbed me by my penis. At first, I thought she was joking.

Q. You say she grabbed you by your penis?

A. Yes.

Q. Did she grab you lightly, grab you one hand?

A. Yes, as I recall, it was one hand and it was light, that's why I thought she was joking.

Q. You thought she was just fooling around or something like that?

A. At first I did.

Q. Maybe her way of getting you not to yell at her or—

A. Just to cool off things a little bit.

Q. Okay. What happened, what happened then?

A. I asked her to let got (sic).

Q. Did she let go?

A. No.

Q. What happened?

A. I tried to remove her hand then and she tightened up. I believe she grabbed me with the other hand then.

Q. Okay. So, you're standing there, both of you at the foot of the bed. She has got ahold of you with, you think, both hands?

A. Yes, I know, I know it was both hands.

Q. What does she do, or what happened?

A. Well, I tried to remove her hands. I kept telling her, let go, let go. I know I told her to let go more than once. I was tussling around with her, trying to move her hands. I don't believe she yanked on me on purpose. She yanked my penis.

Q. How did you respond?

A. Responded in excruciating pain.

Q. What did you do?

A. She was still holding onto me when she wasn't yanking on it and I didn't want her to fall down on the floor. She fell down easily. So, I put my left hand around her neck and I pushed her down on the bed.

Q. Okay. Did she let go?

A. No, she didn't.

Q. If you can remember?

A. No, she didn't let go then.

Q. So, did you go down on the bed with her then?

A. Yes, on my knees.

Q. What did you do after—you had your hand on her neck and you pushed her down and then what did you do?

A. I slapped her.

Q. Do you recall how many times you slapped her?

A. All I recall is being in a panic because I was afraid she was going to yank on it again and it was real pain. I think I slapped her once. But, you know, I wasn't thinking. Maybe I slapped her more than once. I just wanted her to let go.

Q. Were you trying to kill her when you hit her?

A. Of course not. The pictures that Mr. Benardino has are awful compared to the way she looked before she had that operation. Her, her, [sic] I know my wife. I seen her smacked before and those bruises reflected the way she nor-

mally would look if she was smacked with an open hand.

Q. Did you hit her with your fist or did you hit her with your open hand?

A. I wouldn't hit my wife with my fist. I hit, I slapped my wife with my open hand.

Q. Were you intending to hurt her severely or cause her serious bodily injury?

A. Of course not. I was trying to, I was trying to get my wife well. I loved my wife. We were together for 24 years. I told my wife, "I don't want anybody but you. I don't want you to have to go away, you're going to die on me."

The details of the events described by appellant must be considered in light of the testimony of the medical examiner, Dr. Aurelio Espinola. Dr. Espinola testified that the cause of Brenda's death "was the subdural hematoma and contusion of the pons due to blood (sic) trauma." Dr. Espinola also testified that in his expert opinion the victim's death was a result of a homicide, and not an accident such as a fall. In fact, Dr. Espinola explicitly ruled out the possibility that the victim sustained her fatal injuries as a result of a fall. Dr. Espinola, although agreeing that the victim's fatal injuries could have been caused by a very forceful blow from a fist, emphasized that it was not so much the amount of force involved, "but the suddenness, the sudden—the force was so sudden that the, it shook the head that the person involved was not ready to expect that blow."

The State also elicited testimony from investigators Steve Degner and Darrell Cheney of the Montgomery County Sheriff's Office. Degner and Cheney interviewed appellant at the hospital after hospital personnel had reported the incident to the Sheriff's Office. Both Degner and Cheney testified as to the visible physical injuries to the victim: bruises under the eyes and "busted" lip. Degner testified that the first thing that came out of appellant's mouth was, "I didn't hit her that hard." Cheney related that appellant made the statement that "he (appellant) really, didn't mean to hit her that hard...."

As alluded to earlier, compelling testimony was elicited by the State from three of the victim's adult children, Patricia Price, Wanda Johnson, and Curtis West. Curtis is the natural child of appellant and the victim while Patricia and Wanda are appellant's step-children. All three testified to observing physical injuries on the victim on many occasions over a 10 to 15 year period during the victim's marriage to appellant. These injuries were consistent with the injuries observed on the day in question by Detectives Degner and Cheney, and observed by Dr. Espinola during his autopsy.

We find, therefore, that the totality of the evidence presented by the State satisfied the *Jackson v. Virginia/Torres* standard set out earlier in this opinion. The State's evidence portrays the assaultive conduct by appellant on the victim on the day in question as essentially "business as usual." Indeed, appellant's own testimony indicates an almost proud attitude in his being able to know what the victim usually looked like after being slapped around by appellant. These witnesses, as well as the appellant's testimony to a certain extent, portray appellant's "normal" procedure for settling conflicts or disagreements with the victim as one of using physical violence to some greater or lesser degree. The jury could have reasonably inferred that, rather than under the influence of sudden passion, appellant was handling a conflict with the victim as he normally would, or that the day had come when appellant finally made good on his promise to kill the victim. In light of the above discussion, therefore, we overrule point of error two.

◼ Appellant's third point of error complains of the trial court's refusal of appellant's timely requested charge to the jury on self-defense. Appellant discusses a number of cases that stand for the general proposition that a defendant is entitled, upon timely request, to an instruction on every affirmative defense raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted. In the instant case, however, there is no testimony from any source that the victim's act of grabbing appellant's penis and squeez-

ing or pulling on it constituted "deadly force."[2] Appellant was charged with an offense involving deadly force on his part. TEX.PENAL CODE ANN. sec. 9.31 (Vernon 1974) covers the law involving issues of non-deadly force. Section 9.31(d) explicitly provides: "The use of deadly force is not justified under this subchapter except as provided in Sections 9.32, 9.33, and 9.34 of this code.[3] Thus, even if otherwise appropriate, a self-defense instruction tendered to the jury under the language of section 9.31 would not have authorized the jury to acquit appellant, and would, therefore, have been no help to appellant.

Section 9.32 provides justification for individuals who use deadly force in self-defense. Section 9.32 reads in pertinent part:

A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31 of this code;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; ....

The trial court was correct in finding that section 9.32 had no application to the facts before him as there was absolutely no evidence presented that appellant was justified in using deadly force in response to his wife's "use or attempted use of *deadly force.*" The victim's actions of grabbing and pulling on appellant's penis, although causing appellant great pain, were not shown to have been deadly, nor shown to have caused appellant serious permanent disfigurement or protracted loss or impair-

ment of his penis. Point of error three is overruled.

Having overruled appellant's three points of error, we affirm the judgment and sentence of the trial court.

AFFIRMED.

BURGESS, Justice, concurring and dissenting.

I concur in part and dissent in part. I concur in the majority's resolution of the first point of error. There is sufficient evidence for the jury to have found that appellant intended to cause serious bodily injury to his wife and committed an act clearly dangerous to human life. I dissent to the majority's resolution of points of error two and three.

The second point of error alleges the state failed to prove, beyond a reasonable doubt, the absence of "sudden passion" and "adequate cause" as required for a conviction of murder. The majority acknowledges the evidence was sufficient to raise the issue of sudden passion. *Medlock v. State*, 591 S.W.2d 485 (Tex.Crim.App.1979). They further acknowledge that if the issue is raised, but a jury finds a defendant guilty of murder, the court must make two determinations: (1) whether the evidence was sufficient to establish the offense of murder and (2) whether the evidence was sufficient to disprove the issue of sudden passion. *Johnson v. State*, 815 S.W.2d 707, 711 (Tex.Crim.App.1991). We all agree the evidence was sufficient to establish murder. We agree as to the law regarding the second determination, but disagree as to the quantum of evidence. A jury may reject sudden passion, even though it is raised by the evidence, but may not find facts necessary to establish the absence of sudden passion "purely on the basis of its disbelief of the accused's con-

---

**2.** "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX.PENAL CODE ANN. sec. 9.01(3) (Vernon 1974).

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function

of any bodily member or organ. TEX.PENAL CODE ANN. sec. 1.07(34) (Vernon 1974).

**3.** We will discuss the content of section 9.32 momentarily. Section 9.33 deals with defense of a third person, and section 9.34 deals with protection or attempts at preserving the life or health of individuals who have inflicted injuries upon themselves.

trary assertions." *Johnson,* 815 S.W.2d at 711; citing *Gold v. State,* 736 S.W.2d 685, 689 (Tex.Crim.App.1987), *overruled in part on other grounds,* in *Torres v. State,* 785 S.W.2d 824 (Tex.Crim.App.1989). First, was there sufficient evidence on which to base a finding of no adequate cause? I think not. The only evidence concerning the altercation that morning is that Brenda West grabbed appellant's penis and would not let go, causing pain. Next, was there sufficient evidence on which to base a finding of no immediate influence of sudden passion? This is a more difficult question. The medical evidence does not show a prolonged beating. It does not contradict appellant's statement that he struck his wife three times, at the most, with his open hand. While there was evidence that appellant had struck his wife in the past and had even acknowledged the possibility that he might be driven to enough rage to kill her, I am unable to say, that a rational trier of fact could have found beyond a reasonable doubt, that the acts committed the morning of Brenda's injuries were the result of previous provocations rather than sudden passion. Therefore, I would sustain point of error number two and order an acquittal to the offense of murder, but authorize a retrial on the remaining offenses.

I also dissent to the majority's holding regarding the trial court's failure to charge the jury on self defense. I believe the trial judge refused the instruction on self defense due to his misinterpretation of the right to use deadly force. It is apparent from the charge conference that the judge determined since a death occurred, then appellant used deadly force and was not entitled to the instruction since he was not confronted with deadly force. The trial court focused only upon a portion of the definition of deadly force. Deadly force is not only force that is capable of causing death, but also force that is capable of causing serious bodily injury. TEX.PENAL CODE ANN. § 9.01(3) (Vernon 1974). Whether the grabbing of appellant's penis is within the definition of deadly force is a fact question for the jury. Appellant was entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence was strong, weak, unimpeached or contradicted and regardless of what the trial court may or may not think about the credibility of the evidence. *Hayes v. State,* 728 S.W.2d 804, 807 (Tex. Crim.App.1987). Appellant was entitled to a charge on self defense under TEX.PENAL CODE ANN. § 9.32 (Vernon Supp.1993). I would sustain point of error number three and remand for a new trial on this issue alone.