Alphonso Nickerson, Jr. v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-180-CR

ALPHONSO NICKERSON, JR. APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Alphonso Nickerson, Jr. appeals his convictions for murder and aggravated sexual assault.  After the jury rejected Nickerson’s insanity defense and found him guilty, the trial court sentenced Nickerson to life in prison. Nickerson raises six points complaining about the legal and factual sufficiency of the evidence.  We will affirm.

II.  Factual Background

On June 2, 1997, Nickerson fought with his wife Bennie, whom he suspected was having an affair.  Nickerson hit Bennie with his hand and then with a belt.  After Nickerson fell asleep, Bennie called the police, and they took Nickerson to jail.

On June 3, 1997, Nickerson was released from jail, and police told him that Bennie had obtained a restraining order against him and that he could not return to his home.  Nickerson therefore went to Jacqueline Welton’s home.
(footnote: 2) Welton heard a knock on her door at around midnight.  
She looked out the peephole and saw Nickerson.  Nickerson kept knocking and calling Welton’s name, saying that he needed to talk to her.  Welton told him through the door that he was not supposed to come by her house, but she eventually opened the door.

Once inside, Nickerson told her that he had caught Bennie with another man, had confronted the man, and was put in jail.  Welton said Nickerson was angry and upset but that he was not acting bizarre.  Nickerson explained that he could not go back home because of the restraining order.  He suggested Welton have sex with him and told her that he could “have [her] right now”; she said that he could not, and he responded by saying, “But you let me in.”  Nickerson told Welton that no one would believe he had attacked her because she had let him in her house.  He asked Welton if she would consent to sex and indicated that if she did not, he would “take it.”  Welton told Nickerson to leave, but he refused and boxed her in as she sat on a couch. Welton managed to get up, and she went to the front door, telling Nickerson to leave.  Nickerson walked out, but he turned around and put his arm around Welton’s neck.  She started screaming, and Nickerson put his hand over her mouth and dragged her to the bedroom.  He threw her on the bed and pinned her down.  Welton testified that Nickerson laid on top of her, put his hand over her mouth, and pulled her clothes off with his other hand.  She tried to hit him and begged him to stop. Suddenly, Nickerson got up and said that he had to leave.  He told her not to call the police and admitted that he had assaulted his wife after catching her in bed with a nephew.  Then, he left.  Welton’s lip was cut where Nickerson had placed his hand over her mouth.  
Welton testified that as far as she knew, Nickerson did not have any history of mental illness; he had never acted mentally ill in front of her; and her interactions with Nickerson never suggested that he did not know right from wrong. 

Nickerson also called Joann Dawson
(footnote: 3) that night.
(footnote: 4)  Dawson testified that Nickerson wanted to know if he could come take a shower and change clothes at her place because he could not go home.  She said no.  She testified that Nickerson sounded okay during their conversation and that in the years she has known Nickerson, he has been rational and has never complained of fits of epilepsy or of a head injury. 

Nickerson reportedly spent the night of June 3, 1997 in his truck.  The next morning, he went to Maxine Nash's house.  At approximately 9:45 a.m. on June 4, 1997, a neighbor passed Nash's house and saw Nash talking to a tall, big man, wearing jean shorts.  The neighbor testified that Nash appeared to be in good health and that everything appeared to be okay.  During the trial, she identified Nickerson as the man whom she saw talking to Nash. 

Nash's grandson, Dougquallas LeGrand
, lived with Nash and came home shortly after 9:45 a.m.  He knocked on the door for about twenty minutes but received no answer.  He found it very odd that Nash did not answer the door, so he walked to the back of the house and knocked on the back doors.  As he circled the side of the house, he heard a noise.  He knocked on the windows, screamed for his grandmother, and broke a window.  Scared, he left to get a police officer.  He saw an officer driving down the street, flagged down the officer, and the officer followed him back to Nash’s house.  From the side of Nash’s house, they heard, “I'm f---ing you, I'm f---ing you, I'm f---ing you, you curly-headed motherf—er, I'm f---ing you,” being chanted.  The police officer, Marvin Reddick, called for back up, and LeGrand kicked in the door.  He saw his “grandmother jacked up in the chair with a dude, you know, on his knees, butt naked” and heard Nickerson saying the same thing over and over. 

Officer Reddick testified that he was responding to another call when LeGrand flagged him down at 10 a.m.; LeGrand said that he needed help because he thought something was wrong with his grandmother.  Officer Reddick arrived at Nash’s house within a minute and a half.  He saw a broken window on the east side of the house and heard a television and another noise that sounded like moaning.  Officer Reddick was not aware that LeGrand had broken the window, so he believed an intruder might be in Nash’s house and called for backup.  

Sergeant Cortez and Officer Driver arrived two to three minutes later. Officer Reddick testified that, after LeGrand kicked in the front door, he saw a man lying on top of someone.  The man was “[lying] atop of [the] complainant, and she wasn't moving, but he was humping her, per se, in a sexual manner and kept repeating, 'I - I got you, sap-sucker b----, you,' were his exact words. . . .  He said that repeatedly.”  Officer Reddick explained that Nash was slouched in a chair, naked from the waist down, and that her legs were crouched; Nickerson was naked and was in between her legs, thrusting at her in a sexual fashion. Officer Reddick testified that Nickerson's genitals were contacting Nash's genital area and that it looked like Nickerson was having intercourse.  Officer Reddick described Nickerson as having his full body weight on top of Nash as he thrust at her; Nash was slumped in the chair, her neck was crunched forward, and her face was dark. 

Officer Reddick asked Nickerson to get up off of Nash, but Nickerson did not respond.  Three or four officers pulled Nickerson off Nash.  The police called for their “paddy wagon” because Nickerson could not fit into a police car.
(footnote: 5)  The officers lifted Nickerson into the “paddy wagon”; Nickerson repeated his phrase without acknowledging the police. 

Officer Reddick testified that he now knows that the sound he heard outside Nash’s window was Nickerson chanting.  He never heard a woman's voice and did not notice any scratches on Nickerson.  Officer Reddick said that Nickerson's chin contacted Nash's forehead as he thrust at her and Nickerson would have been able to hear Nash breathe.  
Officer Reddick noticed blood at the bottom of the chair where Nash sat and saw that Nash's underwear had been torn off.  
Nash's body, including her arms, appeared to be compressed in the chair.  He noted that rigor mortis had set in on Nash's body.

When Nickerson arrived at jail, a crime analyst took a penile swab from Nickerson.  Nickerson was placed into a pressure point chair device for restraining unresponsive prisoners.  After approximately thirty seconds in the chair, Nickerson appeared alert and asked, “Where am I?”  Sergeant Donald Thomas Hanlon 
testified that he believed Nickerson had been “playing possum”—that he was aware of his surroundings and had been faking it; once it became uncomfortable for him to sit in the chair, he became responsive so that he could get out of the chair. 

Nickerson’s case was assigned to a homicide detective with the Fort Worth Police Department
, Dian Tefft Wright
, at 10:20 a.m. on June 4, 1997.
 She arrived at Nash’s house at 10:38 a.m. and noticed that Nash was “all squashed down in the chair, and she didn’t have any clothes on from the waist down, and she was . . . [i]n a spread-out position.”  She saw the remains of Nash’s panties—just the waistband—across Nash’s abdomen; she thought it looked like the panties had been ripped apart at the crotch.  Nash’s head was between her knees, and she was twisted over in that position when Wright found her.  She saw Nickerson’s blue jean shorts on the floor.  She heard Nickerson rambling a phrase “like a broken record” and testified that in street parlance, “I f----d you,” means sexual intercourse that is generally forceful, possibly without consent.  She further testified that it is a slang term, meaning “I got what I wanted,” and that it implies a penis penetrating a vagina.  She stated that Nickerson chanted more loudly when she tried to speak to him. Officer Wright met with Nickerson the next day in the homicide office.  He was not mumbling and appeared rather calm.  He said that he understood the 
Miranda
(footnote: 6) warnings and mentioned that Glynis McGinty was his lawyer.  She discontinued the interview, and police took Nickerson back to jail.

Bill Watson, formerly a forensic serologist with the Fort Worth Police Department, testified that he collected a penile swab sample from Nickerson on June 4, 1997.  He collected a blood sample from Nickerson on June 5, 1997.  During the blood draw Nickerson was repeating, “God help me,” or “Help me, God.”  He testified that a vaginal swab collected from Nash contained sperm. Joe Warren, who was employed in 1997 as a senior forensic biologist with the Tarrant County Medical Examiner’s Office, testified that he did DNA testing on the samples collected in this case.  His testing demonstrated that the vaginal swabs from Nash contained DNA from which Nash and Nickerson could not be excluded as contributors.  The testing on the penile swab taken from Nickerson revealed a mixed sample of DNA, and both Nash and Nickerson could have contributed to the DNA found in that mixture.  The calculations he performed showed that 94.9% of the Caucasian population was excluded, 83.5% of the African-American population was excluded, and 96% of the Hispanic population was excluded.  He said that assuming that they did not know who the penile swab was from, it is 57,800 times more unlikely that the DNA came from two unknown people as opposed to Nash and Nickerson. Aaron Martinez, formerly with the Tarrant County Sheriff’s Department, testified that during 1997 he reviewed inmate mail.  He made a report about the following letter, written by Nickerson.

Dear Von and Mama, I am truly embarrassed and ashamed by these chain of events.  I did hassle Penny [sic] and Jackie, but I did not kill Ms. Nash.  She was like Aunt Lindy in Pal Terrace.  She introduced me to Joann back in 1980.  She worked at John Peter Smith Hospital for over 20-plus years as an LVN. . . .  She and I had been intimidated [sic] once or twice -- once or twice, years ago, when I went to visit her.  She said that she needed help sexually, but I couldn’t respond.  She died while I was trying to become erect.  I noticed her eyes going back in her head, showing nothing but the white.  I tried to give her mouth to mouth resuscitation, to no available [sic].  She died, and I was in total shock.  I stayed there, pants down, depressed.

Dr. Gary Sisler, deputy medical examiner for Tarrant, Parker, and Denton counties, testified regarding Nash’s autopsy results.  He described Nash as a sixty-four-year-old woman who was five feet, seven inches tall and weighed approximately 185 pounds.  Her white panties were torn through the crotch area.  She had bruises on the front of her right and left thighs and lower legs, and the color of the bruises indicated that they occurred before her death. The autopsy revealed that while she was alive, Nash had suffered a four-inch-deep stab wound near her anus, causing approximately 100 milliliters of blood to fill her abdominal cavity.
(footnote: 7)  Dr. Sisler opined that a knife with a single sharp blade likely caused the wound and that it would be very painful.  Nash suffered a compressive injury to her left upper lip, probably when Nickerson put his hand over her mouth and caused her lip to be cut by her teeth.  He also noted a small bruise underneath Nash’s scalp in the left frontal area, consistent with her head bumping into the wooden arms of the chair.  Nash’s face was dark, congested with blood.  Dr. Sisler concluded pressure had been applied to Nash’s chest, preventing blood from draining from Nash’s face.  Nash was holding her hands over her face, a defensive posture, when she died.  Dr. Sisler testified that Nash’s injuries are consistent with a struggle and that a struggle could not have occurred after Nash was unconscious. 

The cause of Nash’s death was sudden death associated with the stab wound to her perineum and “overlie,” a form of traumatic asphyxia caused by another person’s body weight being placed on the victim’s chest.  He explained that “overlie” prevented Nash from breathing.  Within thirty seconds, her heart would have started to slow down; within ninety seconds she would have “flatlined.”  During this time, Nickerson would have heard Nash struggling to breathe.  He said that a man weighing in excess of 300 pounds who lays on an elderly woman slouched in a chair commits an act clearly dangerous to human life and that a 300-pound body used in this manner is a deadly weapon.  In his opinion, Nickerson should have been aware of the danger created by a 300-pound man placing his full body weight upon the chest of a woman of Nash’s size.

III.  Procedural Background

This appeal is from a judgment entered following Nickerson’s second trial.  In Nickerson’s first trial, a jury found him guilty of murder and of two counts of aggravated sexual assault, including aggravated sexual assault by use or exhibition of a deadly weapon.  The Waco Court of Appeals held, however, that the latter aggravated sexual assault was jeopardy-barred.  The Waco Court of Appeals reversed and remanded the cause for a new trial on murder and aggravated sexual assault by threat because it held that the State failed to timely disclose a videotape depicting an alleged psychotic incident by Nickerson on January 8, 1999 while he was in jail.  
Nickerson v. State
, 69 S.W.3d 661, 675 (Tex. App.—Waco 2002, pet. ref’d).

During the second trial, Nickerson called three experts to testify concerning his affirmative defense of insanity.  The State called its own expert to testify to rebut the defense’s position that Nickerson was insane when he assaulted and killed Nash.  The jury rejected Nickerson’s insanity defense and found him guilty of murder and aggravated sexual assault; the trial court sentenced Nickerson to life in prison.  This appeal followed.

IV.  Standards of Review

A. Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In determining the legal sufficiency of the evidence to show appellant's intent, and faced with a record that supports conflicting inferences, we “must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.”  
Matson v. State
, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

B. Factual Sufficiency Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

C. Factual Sufficiency Standard of Review for Insanity Defense

Insanity is an affirmative defense to prosecution.  
Tex. Penal Code Ann.
 § 8.01(a) (Vernon 2003).  To prevail on the affirmative defense of insanity, the defendant must prove by a preponderance of the evidence that, at the time of the conduct charged, and as a result of severe mental disease or defect, he did not know that his conduct was wrong.  
Id.
 §§ 2.04(d), 8.01(a).  The purpose of a jury finding on the insanity defense is to determine whether the accused should be held responsible for the crime or whether a mental condition excused the defendant from such responsibility.  
Graham v. State
, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978).

Legal insanity is not strictly a medical issue.  
Id.
 at 949.  Experts may help the jury in their determination, but the experts cannot dictate an insanity determination.  
Id.
  The jury may accept or reject, in whole or in part, the opinion testimony of medical or psychological experts and may accept lay testimony over the testimony of experts.  
Id.
  Likewise, the jury may choose to believe or disbelieve any witnesses or any portion of a witness’s testimony and may believe a witness even though his testimony is contradicted.  
Turro v. State
, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).  As an appellate court, when faced with conflicting inferences, we must presume that the trier of fact resolved any such conflict in favor of the verdict and must defer to that resolution.  
Smetana v. State
, 991 S.W.2d 42, 44 (Tex. App.—Tyler 1998, pet. ref’d).

In conducting a factual review of an affirmative defense, the proper standard for review is, whether after considering all the evidence relevant to appellant's affirmative defense of insanity, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust.  
Bigby v. State
,   892 S.W.2d 864, 875 (Tex. Crim. App. 1994).

V.  Proof of Nickerson’s Sanity

In his sixth point, Nickerson contends that the evidence is factually insufficient to negate his insanity defense.  The State responds that, viewing all of the evidence, the jury’s failure to find that Nickerson was insane at the time of the offense was not against the great weight and preponderance of the evidence. 

A. Expert Testimony

During the trial, the defense called three doctors—Dr. Clifford Alan Hopewell, Dr. Allen Childs, and Dr. Kelly Goodness—to testify in support of Nickerson’s affirmative defense of insanity.  The State called Dr. Tim Proctor.  Each of the experts reviewed Nickerson’s mental and medical history, Nickerson’s version of the events, and video tapes of Nickerson’s behavior in jail.  The experts  discussed with the jury Nickerson’s possible diagnoses, other explanations for Nickerson’s behavior, and whether Nickerson knew right from wrong.

1. Defense Witness—Dr. Clifford Alan Hopewell

Dr. Hopewell explained that although Nickerson has a college degree and has taught school, his IQ is 70.  Dr. Hopewell said that the discrepancy between Nickerson’s college education and his current level of mental functioning indicate that Nickerson has experienced a mental decline over time.  He said that Nickerson’s background showed sexual maladjustment and marital instability.  
The overall results of Dr. Hopewell’s testing indicate that Nickerson possesses a lowered intellectual functioning level and has problems with the frontal and temporal lobes of his brain.  Dr. Hopewell explained that damage to the brain’s temporal lobes disrupts a person’s perception of reality, which may lead to personality changes.

Dr. Hopewell diagnosed Nickerson as suffering from a catatonic disorder due to subclinical temporal lobe epilepsy and testified that Nickerson experienced  a seizure during the murder.  Nickerson told Dr. Hopewell that he could not remember the offense. And, according to Dr. Hopewell, after a seizure episode it is likely that Nickerson would not recall the offense but would recall only things other people told him about it.  
Dr. Hopewell admitted that typically a neurologist, not a neuropsychiatrist like himself, would diagnose epilepsy; that he does not know anyone who, prior to June 4, 1997, witnessed an epileptic seizure by Nickerson; and that Nickerson’s EEG and MRI are normal.  Nickerson told Dr. Hopewell that he had received a head injury when he was eight, but he denied any history of head injuries, loss of memory, amnesia, or epilepsy on a recent employment application.

Dr. Hopewell reviewed the January 8, 1999 tape of Nickerson in jail.  He testified that the tape did not show Nickerson malingering; instead, it documented a psychotic episode.  

2. Defense Witness—Dr. Allen Childs

Dr. Childs, the chief psychiatrist of the multiple disabilities unit at North Texas State Hospital in Vernon, got involved in Nickerson’s case after Dr. Goodness requested his services.  He testified that 
Nickerson’s mother told him that Nickerson had spells as a child where he would “be out of it,” staring away glassy-eyed.  According to Dr. Childs, not long before the June 4, 1997 event, Nickerson was hit in the front of his head with a metal bar.  

Nickerson told Dr. Childs that he just wanted to take a shower at Nash’s house; when he got out of the shower, Nash was dead.  Nickerson said the police cut off his undershorts to make it look like he had raped Nash.  Nickerson also blamed his actions on mental illness stemming from a fall he took off a company truck, from receiving steroid shots in the past, from taking ten different kinds of pain medications, and from being drugged by the coffee at home.  Dr. Childs doubted that Nickerson was having intercourse with Nash; he believed that Nickerson’s use of the “f word” did not indicate penetration, only a state of automatic behavior.  According to Dr. Childs, the whole catatonic episode Nickerson experienced at Nash’s house is not compatible with sexual arousal.  Dr. Childs testified that Nickerson’s letter to his mother, confirming parts of the offense, does not negate Nickerson’s insanity during the offense because Nickerson may have created memories to fill in the episode.  Dr. Childs believed that Nickerson did not know what happened during the June 4, 1997 episode.

Dr. Childs testified that the January 8, 1999 tape documents an episode of catatonic excitement experienced by Nickerson.  The tape shows Nickerson being sprayed with pepper spray, and Dr. Childs testified that Nickerson’s lack of perception of pain is typical of a catatonic episode.  The tape also shows Nickerson flooding his cell and laying in the water on the floor to remove the pepper spray.  This behavior was not “purposeful behavior” according to Dr. Childs and did not demonstrate goal-oriented behavior.  The January 6, 1999 tape shows Nickerson praying for hours, refusing meals, and being unresponsive to jail personnel.  Dr. Childs believes that this tape shows Nickerson having early signs of a psychotic episode.  He does not believe that Nickerson was malingering. 

Dr. Childs concluded that Nickerson suffers from a condition called periodic catatonia, a seizure-like behavior that resembles temporal lobe epilepsy. He said that Nickerson’s behavior on June 4, 1997 was consistent with the type of seizures that he thinks Nickerson has; Nickerson could go from appearing to carry on a conversation with a person in the front yard to this catatonic state where he would not know what he was doing.  He saw no similarities between Nickerson’s attempted assault of Welton ten hours earlier and his assault of Nash.  Nickerson’s mental state was different on June 4, 1997 than it was the night before. 

Dr. Childs explained that although Nickerson’s MRI and EEG, performed within six weeks of trial, were normal, a person with periodic catatonia can have a normal EEG.  
Dr. Childs stated that at the time of the offense, Nickerson did not know right from wrong and was not sane within Texas’s definition of that term.

3. Defense Witness—Dr. Kelly Goodness

Dr. Goodness, a clinical and forensic psychologist, testified that
 Nickerson told her that he used his belt to “spank” his wife, as if she were a child.  Dr. Goodness said Nickerson’s attitude towards women was not good; it was hostile or demeaning.  Nickerson’s MMPI testing revealed that he is a three four four three; “the most salient characteristic of the three four four three person is chronic, intense anger.  They harbor hostile and aggressive impulses, but they are unable to express their negative feelings appropriately.” 

She testified that Nickerson had no ability during the offense to think through or comprehend his actions.  Nickerson’s lack of reaction when the police burst in to Nash’s house indicates to her that Nickerson did not understand that what he was doing was wrong. 
 Nickerson’s behavior on the January 8, 1999 tape was, in her opinion, so striking that it was impossible for Nickerson to fake.  She said she did not observe any goal-oriented behavior by Nickerson on the January 8, 1999 tape.  In her opinion, Nickerson could not be engaged in goal-oriented behavior during that type of seizure.  After seeing the video, she began to think that there was something organically wrong with Nickerson’s brain. 

Dr. Goodness believes that Nickerson was psychotic and was having a seizure when LeGrand knocked on Nash’s door.  Her conclusion from all the data is that Nickerson was in a catatonic psychotic state throughout the offense. 

After Dr. Goodness read portions of Welton’s testimony from the first trial, she agreed that she was doubtful that Nickerson was insane during Nash’s murder.  She admitted that insanity is especially rare in a sexual assault case. Also on cross-examination, Dr. Goodness admitted that in a phone call she told the district attorney, “I have no way of knowing whether or not Mr. Nickerson was in the midst of his catatonic episode at the moment that he began assaulting Ms. Nash or whether the episode began during the assault.” 
4. State’s Witness—Dr. Tim Proctor

Dr. Proctor, a clinical psychologist, testified that he had reviewed numerous documents and the jail video tapes and that he had met with Nickerson for two and a half hours.  Nickerson was cooperative during the interview and did not present with any symptoms of mental illness.  Nickerson told Dr. Proctor that he had a bachelor of science and a master’s degree, he described six incidents of head injuries that he claimed to have suffered, and he admitted that he had a history of domestic violence.  Nickerson then described the days leading up to the June 4, 1997 event.  

With regard to the event itself, Nickerson said that he came out of Nash’s bathroom and found Nash in a chair in the “fetus [sic] position.”  He thought that Nash had choked, so he performed the Heimlich maneuver and mouth-to-mouth resuscitation.  Nickerson said that police arrived and cut off his shorts and underwear.  He stated that he did not know how Nash’s stab wound occurred, and he denied any sexual conduct.  Dr. Proctor summarized his perspective of Nickerson’s mental state during the events described by Nickerson as leading to the murder.  Nickerson knew the day before the murder that his actions toward Bennie were wrong; police did not notice anything unusual about Nickerson’s mental state; Nickerson had a goal-oriented conversation with Joann Dawson; and he told Welton not to call the police after he almost assaulted her.  Dr. Proctor testified that the fact Nickerson ripped off Nash’s underwear constitutes a purposeful, goal-oriented act.

In the video tapes of Nickerson, Dr. Proctor observed manic behavior, characterized by racing speech for an extended duration and sexual acting out. He noted that Nickerson acknowledged the presence of other people during his rages.  He summarized the goal-oriented behaviors that Nickerson engaged in—flooding his cell, masturbation-like activity, having a towel waiting to wipe pepper spray off his face, and placing his arms in the bars to block the jail cell locking mechanism.  Nickerson admitted to Dr. Proctor that he flooded and urinated in his cell to make it hard for the guards to get their footing.  Dr. Proctor concluded that there is no evidence that Nickerson’s condition at the time of the offense resembled his behavior on the tape. 

With regard to the similarities between Nickerson’s actions towards Welton and the offense committed against Nash, Dr. Proctor noted that it was very striking that (1) the injuries to both Welton’s and Nash’s lips were in precisely the same place and (2) Nickerson boxed Welton into a couch and compressed Nash into a chair.  

Dr. Proctor diagnosed Nickerson as suffering from bipolar disorder that was in remission during trial.  He also noted that Nickerson has antisocial and paranoia personality traits.  He stated that Nickerson’s behavior and actions were clearly violent, aggressive, hostile, and demeaning to women, but did not demonstrate a mental illness.  Dr. Proctor found no evidence of epilepsy and no evidence of organic brain damage; he thus disagreed with Dr. Childs’s and Dr. Goodness’s opinions. 

In Dr. Proctor’s opinion, Nickerson knew right from wrong at the time he assaulted and killed Nash.  Dr. Proctor stated that there is no indication that Nickerson did not know right from wrong.  The State questioned Dr. Proctor regarding Nickerson’s mental state when he committed the offenses against Welton and Nash:

Q.  Okay.  It’s just very difficult to believe he would commit the exact same offense almost ten hours earlier and then suddenly ten hours later tries to recommit the same behavior and suddenly he’s insane?

A.  I think that would be a large leap to take that I don’t see any support for.

Additionally, Nickerson admitted to Dr. Proctor that he knew right from wrong, that murder and rape are against the law, and that he was aware of that at the time of the offense.

B. Analysis

Nickerson presented expert opinion evidence that he was insane at the time that he sexually assaulted and killed Nash and presented evidence that he acted bizarrely in jail.  The record also includes lay and expert testimony that Nickerson had no history of mental illness and that he was not legally insane on June 4, 1997.  The jury’s responsibility was to determine whether Nickerson’s evidence or the State’s evidence was more credible and to determine the weight to be given to that evidence on the one issue that mattered:  whether Nickerson, as a result of mental defect or illness at the time he sexually assaulted and murdered Nash, did not know that his conduct was wrong.  The jury could have believed that Nickerson was malingering a mental illness, was a rapist, or was in the throws of a manic episode associated with bipolar disorder and that he retained the mental capacity to conform his actions to the law.  The jury could have considered Nickerson’s own statement to Dr. Proctor as evidence that he knew right from wrong when he assaulted and killed Nash on June 4, 1997.  
See, e.g., Turro
, 867 S.W.2d at 47.  We hold that the evidence is factually sufficient to refute Nickerson’s affirmative defense so that the jury’s verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust.  
See Bigby
, 892 S.W.2d at 878 (holding evidence sufficient to negate insanity defense even though several expert witnesses testified that appellant knew his conduct was illegal but did not know the act was “morally” wrong);
 Smetana
, 991 S.W.2d at 47 (holding evidence sufficient to negate insanity defense even though there was conflicting lay and expert testimony).  We overrule Nickerson’s sixth point.

VI.  Intent to Cause Serious Bodily Injury

In his first point, Nickerson argues that the evidence is legally and factually insufficient to prove that he acted with intent to cause serious bodily injury to Maxine Nash.  Specifically, Nickerson contends that the record contains no evidence that he intended to cause serious bodily injury of any type to Nash by lying down on her and that any circumstantial evidence presented by the State was greatly outweighed by the evidence of his defective mental state.

A jury may infer intent from the acts and words of the defendant, the manner in which the offense was committed, the nature of the wounds inflicted, and the relative size and strength of the parties.  
See Patrick v. State
, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); 
West v. State
, 846 S.W.2d 912, 914 (Tex. App.—Beaumont 1993, pet. ref’d).

Here, the parties stipulated that Nickerson is six feet, six inches tall and weighs 300 pounds.  The medical examiner testified that Nash was five feet, seven inches tall and weighed approximately 185 pounds.  When Nickerson laid on top of Nash
(footnote: 8) as she sat in the chair and as he began sexually assaulting her, his chin contacted Nash’s forehead; he was so close to her face that he would have noticed her struggling to breathe, noticed her face becoming dark, and noticed her eyes rolling back into her head. Additionally, the compression wound to Nash’s lip, which was in the same place as Welton, enabled the jury to infer that Nickerson placed his hand over Nash’s mouth, further limiting her ability to breathe.  

The medical examiner testified that a 300-pound man should realize that he cannot lay on top of a woman of Nash’s size for any length of time without suffocating her.  The record demonstrates, however, that Nickerson did not get up when Nash struggled.  He did not attempt to resuscitate her; he remained on top of her, even after she died, and continued thrusting at her body until multiple police officers pulled him off.  Consequently, the jury had before it sufficient 
evidence—Nickerson’s acts and words during the offense, the manner in which the offense was committed, the nature of the wounds inflicted, and the relative size and strength of the parties—from which it could infer Nickerson intended to cause serious bodily injury to Nash.  Furthermore, because we have held that the evidence supports the jury’s determination that Nickerson was sane at the time of the offense, we are not persuaded that a defective mental state prevented him from formulating an intent to cause serious bodily injury.
(footnote: 9) Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Nickerson acted with the intent to cause serious bodily harm.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789;
 Nickerson
, 69 S.W.3d at 667. 
 
Furthermore, viewing all the evidence in a neutral light, favoring neither party, we also conclude that the evidence supporting this finding, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt and that the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt.  
See Patterson v. State
, 950 S.W.2d 196, 202 (Tex. App.—Dallas 1997, pet. ref’d) (holding that factually sufficient evidence existed to show appellant intended to kill or to cause serious bodily injury).  Accordingly, we hold that the evidence is both legally and factually sufficient to establish that Nickerson intended to cause death or serious bodily injury to Nash.  We overrule Nickerson’s first point.

VII.  Act Clearly Dangerous to Human Life

In his second point, Nickerson contends that the evidence is legally and factually insufficient to prove that he committed an act clearly dangerous to human life.  Specifically, Nickerson argues that no evidence exists or that the evidence is factually insufficient to prove that his act of lying down on Nash was clearly dangerous to human life. 

Nickerson’s premise is that no rational jury could have reached the conclusion—his act of lying on Nash was clearly dangerous to human life—beyond a reasonable doubt because “men have been lying down on women during sexual intercourse since the human race began.”  However, the medical examiner directly testified that a man who weighs over 300 pounds commits an act clearly dangerous to human life by lying on a smaller, elderly woman in a chair and causing her to stop breathing by the weight of his body. Consequently, a rational juror could have concluded that Nickerson’s exertion of his own weight upon Nash was “objectively clearly dangerous to human life.”  
See Nickerson,
 69 S.W.3d at 667; 
see also West
, 846 S.W.2d at 914-15 (holding evidence of slapping of 105-pound woman in the mouth by 200-pound “award-winning bodybuilder” sufficient to establish conduct “clearly dangerous to human life”).  We overrule Nickerson’s second point.

VIII.  Proof of Aggravating Elements

In his fourth point, Nickerson claims that the evidence is legally and factually insufficient to prove the aggravating elements of Texas Penal Code sections 22.021(a)(2)(A)(ii) and (iii).  
See
 
Tex. Penal Code Ann
. § 22.021(a)(2)(A)(ii), (iii) (Vernon Supp. 2004-05).  Specifically, Nickerson asserts that the record contains no evidence that his actions caused fear in Nash that would have caused her to submit because the two had known one another for a long time. 

In determining whether the State established the aggravating element of the offense, the jury must assess whether the complainant was fearful, whether the defendant’s conduct caused that fear, and whether the complainant’s fear was a reasonable result of the defendant’s conduct.  
Grunsfeld v. State
, 813 S.W.2d 158, 162 (Tex. App.—Dallas 1991), 
aff’d
, 843 S.W.2d 521 (Tex. Crim. App. 1992); 
Douglas v. State
, 740 S.W.2d 890, 891 (Tex. App.—El Paso 1987, no pet.); 
see also Kemp v. State
, 744 S.W.2d 243, 245 (Tex. App.—Houston [14th Dist.] 1987, pet. ref’d).  The first element, whether the complainant was in fact fearful, is usually established by the testimony of the complainant.  
Douglas
, 740 S.W.2d at 891.  In examining the second and third elements, the jury may consider the defendant’s objective conduct, i.e., acts, words, or deeds, and infer from the totality of the circumstances whether his overall conduct was the producing cause of the complainant’s fear and whether the subjective state of fear was reasonable in light of such conduct.  
Brown v. State
, 960 S.W.2d 265, 268 (Tex. App.—Corpus Christi 1997, no pet.); 
Kemp
, 744 S.W.2d at 245.  Where the objective facts of the assault would naturally cause the complainant to fear for her life or serious bodily injury, it is reasonable to assume that the complainant had the requisite level of fear in the absence of some specific evidence to the contrary.  
Brown
, 960 S.W.2d at 268.  Thus, the fact finder may infer from the totality of the circumstances whether a person’s overall conduct placed the victim in fear of death or serious bodily injury.  
Elkins v. State
, 822 S.W.2d 780, 783 (Tex. App.—Houston [14th Dist.] 1992, pet. ref’d).

Here, we do not have the testimony of the complainant to assist us because she is dead.  However, the evidence demonstrates that Nash received the following injuries before she died:  bruises to the front of her right and left thighs and lower legs, a four-inch-deep stab wound near her anus, and a small laceration under her left upper lip.  Moreover, police discovered Nickerson 
lying on top of Nash, thrusting at her, while Nash was slouched in the chair.

Clearly, a rational trier of fact, looking at the totality of the circumstances, could find that Nash was fearful, that Nickerson caused Nash’s fear, and that Nash’s fear was reasonable.  A person who receives a four-inch-deep stab wound near her anus, endures having her underwear torn off her body, is forcibly pinned by a 300-pound man into a chair in a position that suffocates her, while hearing him repeat forceful, vulgar language, would be in fear of death or serious bodily injury.  
See Nickerson
, 69 S.W.3d at 669; 
see
 
also Lewis v. State
, 984 S.W.2d 732, 734 (Tex. App.—Fort Worth 1998, pet. ref’d); 
Mata v. State
, 952 S.W.2d 30, 32 (Tex. App.—San Antonio 1997, no pet.); 
Elkins
, 822 S.W.2d at 783 (all holding that legally sufficient evidence existed in which objective acts and words utilized by appellant produced a subjective fear of imminent death or serious bodily injury on part of complainant).  We overrule Nickerson’s fourth point.

IX.  Nash Was Alive at the Time of the Alleged Sexual Assault

In his third point, Nickerson contests the legal and factual sufficiency of the evidence to prove that Nash was alive at the time of the alleged sexual assault.

The testimony at trial revealed that Nash was alive around 9:45 a.m. on June 4, 1997 when a neighbor drove by and saw Nash standing in her front yard, talking to Nickerson.  Approximately fifteen minutes later, LeGrand heard  a noise which turned out to be Nickerson chanting, 
“I'm f---ing you, I'm f---ing you, I'm f---ing you, you curly-headed motherf—
er, I'm f---ing you.”  
When Officer Reddick entered Nash’s house a few minutes later, he saw Nickerson on top of Nash engaged in intercourse with Nash.  The medical examiner testified that death from “overlie” occurs within minutes.  The medical examiner also testified that the stab wound near Nash’s anus would have bled more if Nickerson had not remained on top of Nash from when the wound was made until she died.  The absence of more blood from this wound supports an inference that Nickerson was on top of her for the purpose of assaulting her while she was alive.

Viewing all the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Nash was alive at the time that Nickerson began sexually assaulting her. 
See Santellan v. State
, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) (holding that reasonable inference that victim was alive when appellant placed her in car existed because medical examiner’s testimony did not provide unequivocal evidence that victim was dead at the time; medical examiner admitted that her heart might still beat for three to five minutes after bullet hit her head).  We overrule Nickerson’s third point.

X.  Proof that Nickerson Inserted His Penis into Nash’s Sexual Organ

In his fifth point, Nickerson argues that the evidence is legally and factually insufficient to prove that he inserted his penis into Nash’s female sexual organ.  While proof of the slightest penetration is sufficient, this element of the offense must be proved beyond a reasonable doubt.  
Nilsson v. State
, 477 S.W.2d 592, 595 (Tex. Crim. App. 1972).  Penetration may be proved by circumstantial evidence.  
Id.

When Officer Reddick entered Nash’s house, he found Nickerson lying on top of Nash, and Nickerson appeared to be engaged in intercourse.  A forensic biologist testified that a vaginal swab from Nash revealed the presence of sperm and that he found epithelial cells from Nash in Nickerson’s penile swab. 
Viewing all the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Nickerson penetrated Nash’s female sexual organ with his penis.  
See generally Vernon v. State
, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992) (holding that pushing aside and reaching beneath a natural fold of skin into an area of body not usually exposed to view, even in nakedness, is significant intrusion beyond mere external contact, amounting to penetration).  We overrule Nickerson’s fifth point.

XI.  Conclusion

Having overruled Nickerson’s six points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: June 9, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Welton met Nickerson in 1991 when they both applied for jobs as teacher’s aides.  They became friends and talked twice a month by phone. 

3:
Dawson had known Nickerson since 1979 or 1980 and had a personal relationship with him until 1985.  

4:
The record is not clear whether Nickerson visited Jacqueline Welton first or called Joann Dawson first.  During this time frame, Nickerson also attempted to contact Alice Tate, but she was not home. 

5:
Nickerson is six feet, six inches tall and weighs three hundred pounds.

6:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

7:
Dr. Sisler stated that the small amount of blood at the scene from this wound means that Nickerson’s body remained pressed down on Nash’s body from the time the wound was inflicted until Nash’s death. 

8:
The record is replete with evidence showing that Nickerson intended to sexually assault Nash.  For example, Dr. Goodness’s report stated, “Given that Mr. Nickerson had attempted to sexually assault Ms. Welton prior to assaulting Ms. Nash, logic dictates Mr. Nickerson may well have intended sexually assaulting Ms. Nash.”  She also admitted that the similarity of the two offenses suggests that Nickerson had intent with Nash.  

9:
Nickerson’s factual sufficiency analysis under each of his remaining points is centered on his “defective mental state” argument.  Because we have addressed that argument in detail under his insanity defense point and ruled against him, we need not address it each time that it is raised hereafter.  
See
 
Tex. R. App. P.
 47.1.